Andrew M. Calamari
Sanjay Wadhwa
Charles D. Riely
Valerie A. Szczepanik
Alexander M. Vasilescu
William T. Conway III
Philip Moustakis
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0542 (Moustakis)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>          -- against –<br><br>STEFAN LUMIERE,<br><br>                              Defendant. | 16 Civ. ___ (  )<br>ECF CASE<br><br>COMPLAINT<br><br>JURY TRIAL<br>DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendant Stefan Lumiere ("Lumiere" or "Defendant"), alleges as follows:

## SUMMARY

1.      This case involves a fraudulent scheme by Lumiere, a former portfolio manager to

affiliated private funds that invested in credit securities (collectively, "Credit Fund"), to inflate

falsely the value of securities held by the Credit Fund.

2.      From at least July 2011 to January 2013 ( "Relevant Period"), Lumiere, together

with Christopher Plaford ("Plaford"), another portfolio manager to the Credit Fund, routinely

manipulated the valuation procedures of the advisory firm that advised the Credit Fund

("Investment Adviser") by using sham broker quotes to mismark – *i.e.*, misprice or overvalue – securities held by the Credit Fund.

3.      To make the sham broker quotes appear to be real quotes from outside brokers, Lumiere and Plaford told certain "friendly" outside brokers the specific prices they wanted for securities held by the Credit Fund and directed the outside brokers to send – or "U-turn" – the same prices back to them.

4.      After obtaining the sham, U-turned quotes from the friendly brokers, Lumiere and Plaford submitted them to Investment Adviser's back office (*i.e.*, its accounting and/or operations staff) to provide to the Credit Fund's independent administrator as a basis for overriding valuations from established pricing sources which, pursuant to Investment Adviser's disclosed valuation methodology, the independent administrator otherwise would have used to value the securities held by the Credit Fund.

5.      In furtherance of the mismarking scheme, Lumiere also purchased one particular security at an above-market price in order to inflate the apparent value of the security and the apparent value of the Credit Fund's position in the security.

6.      The mismarking scheme ran contrary to the valuation methodology Investment Adviser disclosed to investors and potential investors, which required the pricing of Credit Fund assets to be carried out by Investment Adviser's accounting team, independent of its portfolio managers and trading desk, and to rely on established pricing sources, such as Reuters and Bloomberg.

7.      The Credit Fund and its investors were never told that Investment Adviser used sham quotes to value securities held by the Credit Fund, or that Investment Adviser's disclosed

valuation procedures were being manipulated to inflate the month-end values of Credit Fund assets, as well as its reported net asset value ("NAV") and performance.

8.     As a result of the mismarking scheme, during the Relevant Period, Lumiere knowingly or recklessly defrauded the Credit Fund and its investors by causing:

(a)     Investment Adviser to inflate month-end valuations for securities held by the Credit Fund;

(b)     the Credit Fund to overstate its reported month-end NAVs;

(c)     the Credit Fund to overstate its reported month-end and annual performance;

(d)     the Credit Fund to misclassify certain distressed assets held by the Credit Fund, in monthly reports provided to Credit Fund investors by the fund's independent administrator, as "Level 2" assets, instead of "Level 3" assets, under the Financial Accounting Standards Board's framework for measuring "fair value," codified in Accounting Standards Codification Topic 820 ("ASC Topic 820"), thus falsely indicating to Credit Fund investors and potential investors that the valuation of the distressed assets at issue was based on observable market inputs – *i.e.*, higher quality inputs than would have been the case had the assets been classified as Level 3 assets – which certain investors viewed as a measure of the liquidity of the assets; and

(e)     the Credit Fund to pay management and performance fees to Investment Adviser that it would not have paid but for the falsely inflated valuations of Credit Fund assets.

9.     During the Relevant Period, the mismarking scheme caused:

    (a)     Investment Adviser to overvalue individual mismarked securities held by the Credit Fund, at each month's end, on average, between approximately 5 percent and 35 percent;

    (b)     the Credit Fund to overstate its reported month-end NAVs by as much as 7 percent;

    (c)     the Credit Fund to report a 0.68 percent annual gain for 2011 instead of an approximate 4 percent loss, and a 5.82 percent annual gain for 2012 instead of an approximate 4 percent gain; and

    (d)     the Credit Fund to pay approximately $5.9 million in excess management and performance fees to Investment Adviser.

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Section 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14].

11.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because Defendant may be found in, or is an inhabitant of, or transacts business in this district, and certain of the transactions, acts, practices, or courses of business constituting the violations alleged herein occurred in this district.

12.     Defendant, directly or indirectly, used means or instrumentalities of interstate commerce, of the mails, and/or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANT

13.     **Lumiere**, age 45, resides in New York City.  During the Relevant Period, Lumiere was employed by Investment Adviser as a portfolio manager with trading authority over a portion of the Credit Fund's portfolio.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

14.     **Plaford**, age 38, resides in Bedford, New York.  During the Relevant Period, Plaford was a partner at Investment Adviser and portfolio manager for the Credit Fund, with trading authority over the Credit Fund's portfolio.  Under his agreement with Investment Adviser, Plaford was entitled to a percentage of the performance fees Investment Adviser received from the Credit Fund.

15.     **Trader** was employed by Investment Adviser as a trader for the Credit Fund during the Relevant Period, and was subordinate to both Plaford and Lumiere.

16.     **Investment Adviser** is a Delaware limited partnership, with its principal place of business in New York City, and adviser to the Credit Fund.  Investment Adviser has been registered with the Commission as an investment adviser since April 2011.

17.     **Credit Fund** was comprised of an unregistered, Cayman Islands-based master fund, organized in a master-feeder structure, with a domestic unregistered feeder fund incorporated in Delaware, and an offshore unregistered feeder fund incorporated in the Cayman Islands.  These unregistered funds were "pooled investment vehicles," under Rule 206-4(8) of the Advisers Act [17 C.F.R. § 275.206(4)-8(b)], because they met the definition of "investment

5

company," as defined by Section 3(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3], but for the exclusion from the definition for issuers whose securities were not offered publicly and were owned exclusively by qualified purchasers.

## FACTS

*Background*

18.     In May 2009, Investment Adviser launched the Credit Fund for the primary purpose of investing in debt instruments issued by healthcare companies.

19.     During the Relevant Period, Lumiere was responsible for managing the distressed assets, or "special situations," portion of the Credit Fund's portfolio.

20.     As a portfolio manager for the Credit Fund, Plaford was responsible for making investment decisions on the Credit Fund's behalf.

21.     Generally, the fixed income securities held by the Credit Fund, such as bonds and syndicated loans, traded in an over-the-counter market rather than on an exchange.  Typically, to buy or sell a security in an over-the-counter market, a fund would solicit prices, also called quotes, from a dealer who makes a market in the bond the fund seeks to trade.  The dealer would quote bid/ask prices to the fund to indicate where the dealer is willing to buy (the bid price) or sell (the ask price) the security.

22.     Over its life, the Credit Fund raised roughly $600 million in investor capital. During the Relevant Period, the Credit Fund raised approximately $113 million from new and existing investors.  In March 2012, the Credit Fund reported its peak net assets of $471.5 million.

23.     In April 2013, Investment Adviser closed the Credit Fund and began liquidating its assets.  To date, as a result of its inability to liquidate positions the Credit Fund holds in

certain distressed assets, Investment Adviser has been unable to fully redeem certain Credit Fund investors.

24.     Investment Adviser charged Credit Fund "Series A" investors a 1.5 percent management fee and 15 percent performance fee, and Credit Fund "Series B" investors a 2 percent management fee and 20 percent performance fee, calculated using the Credit Fund's NAV.

***Investment Adviser's Disclosed Valuation Procedures***

25.     Investment Adviser's valuation methodology, as disclosed to investors in offering memoranda and limited partnership agreements for the Credit Fund, and elsewhere, sought to establish "fair value" for the Credit Fund's investments.

26.     During the Relevant Period, Investment Adviser's compliance manual, which was made available to Credit Fund investors and prospective investors performing due diligence on the fund, stated:  "[Investment Adviser] will apply valuation procedures for computing net asset value, or 'NAV', which are based upon GAAP [U.S. Generally Accepted Accounting Principles]" and "[a]ccording to GAAP, companies such as hedge funds are required to use 'fair value' in determining the value of an investment."

27.     The term "fair value" is defined by ASC Topic 820 as "the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an *exit price* at the measurement date from the perspective of a market participant that holds the asset or owns the liability)" (emphasis in original).

28.     In May 2010, Investment Adviser provided at least one Credit Fund investor with responses to a due diligence questionnaire that explained:  "In general, we value investments at

'Fair Value,' which is commonly the most recent transaction price or based upon the most recent bid-ask quotes." Investment Adviser explained in the same questionnaire that the quotes it used to value securities would be "from market makers or broker dealers who transact in such securities."

29.     During the Relevant Period, Investment Adviser's compliance manual stated further that the "pricing function will be carried out by the accounting team which is independent of the portfolio managers and trading desk" and that "[Investment Adviser] will either calculate or verify the accuracy of prices independent of the trading function to the extent practicable."

30.     During the Relevant Period, Investment Adviser's compliance manual stated that valuations would be calculated by the Credit Fund's independent administrator and that "established pricing sources, including but not limited to Bloomberg and Reuters" would be relied upon for the pricing of assets.

31.     Consistent with Investment Adviser's disclosed valuation procedures, Investment Adviser's independent administrator utilized, and provided to Investment Adviser's back office, month-end prices from established pricing sources, such as Reuters and Mark-It (loan pricing services), to value the Credit Fund's various fixed income securities holdings.

32.     During the Relevant Period, pursuant to its disclosed valuation procedures, Investment Adviser could disregard the independent administrators' price, and substitute its own month-end price, for a security held by the Credit Fund *only* when it felt that the "price used by the [a]dministrator was inconsistent with fair value" *and* Investment Adviser could "provide support for its pricing."

33. During the Relevant Period, pursuant to Investment Adviser's disclosed valuation procedures, prices obtained from "dealers" could be used as pricing support, in which case it was "preferential to get at least three dealer marks."

34. During the Relevant Period, the practice of disregarding the independent administrator's price, and substituting its own price, for a security held by the Credit Fund was known at Investment Adviser as a valuation or price "override."

35. During the Relevant Period, Lumiere knowingly or recklessly manipulated Investment Adviser's valuation process to override prices from established pricing sources that the Credit Fund's independent administrator otherwise would have used to price securities held by the Credit Fund with his own, hand-picked, sham quotes, which were U-turned through friendly brokers.

***Lumiere Used Sham Broker Quotes to Manipulate Investment Adviser's Valuation Procedures.***

36. Each month during the Relevant Period, Lumiere and Plaford used valuation overrides to mismark, *i.e.*, falsely overvalue, securities held by the Credit Fund.

37. Each month during the Relevant Period, Lumiere and Plaford caused Investment Adviser to override prices from established pricing sources that, under Investment Adviser's disclosed valuation procedures, should have been used to value Credit Fund assets, with sham prices for certain securities held by the Credit Fund that did not reflect prevailing market values.

38. Each month during the Relevant Period, Lumiere and Plaford each procured sham quotes from one or more of three brokers friendly to them (each a New York-based broker that provided services to Investment Adviser). Lumiere and Plaford then submitted the sham quotes to Investment Adviser's back office as a basis for overriding prices the Credit Fund's independent administrator otherwise would have used to value the securities.

39.     Each month during the Relevant Period, by manipulating Investment Adviser's monthly valuation process, Lumiere (together with Plaford) caused Investment Adviser to mismark anywhere from eight to twenty-eight securities held by the Credit Fund.

40.     During the Relevant Period, the sham broker quotes Lumiere U-turned through the friendly brokers and submitted to Investment Adviser's back office were obtained to support fictitious valuation overrides and were not reflective of fair value as defined by ASC Topic 820.

41.     During the Relevant Period, Lumiere knew or was reckless in not knowing the sham broker quotes he U-turned through friendly brokers and submitted to Investment Adviser's back office were obtained to support fictitious valuation overrides and were not reflective of fair value as defined by ASC Topic 820.

42.     During the Relevant Period, to make the sham broker quotes appear to be real quotes from outside brokers, Lumiere told the friendly brokers the specific prices he wanted for the securities he intended to mismark with the direction to email the price quotes back to him, which the friendly brokers did.

43.     During the Relevant Period, after the friendly brokers emailed the sham quotes to Lumiere, Lumiere and Plaford provided the sham quotes to Investment Adviser's back office as the support required, under Investment Adviser's valuation procedures, to override the Credit Fund's independent administrator's prices for the same securities.

44.     During the Relevant Period, the independent administrator used the sham broker quotes, provided by Investment Adviser as support for its valuation overrides, to calculate the Credit Fund's month-end NAV, performance, and fees.

45.    Lumiere knew or was reckless in not knowing the friendly brokers were not dealers in, and had little or no familiarity with, most of the securities the friendly brokers were asked to quote.

46.    Lumiere knew or was reckless in not knowing the friendly brokers provided him with quotes for securities held by the Credit Fund at prices Lumiere told the friendly brokers to quote without doing any work to verify the accuracy of the quoted prices.

47.    On several occasions during the Relevant Period, a friendly broker responded to Lumiere's request for a specific mark by telling Lumiere, in sum and substance, "I have no idea where this trades at," and Lumiere replied, in effect, "trust me."

48.    During the Relevant Period, Lumiere took several steps to hide the fact that he was procuring sham quotes.  For example:

    (a)    Lumiere used his personal cell phone to call the friendly brokers and request sham quotes for securities held by the Credit Fund.

    (b)    Lumiere, in or about late December 2011 or early January 2012, sent to a friendly broker, by courier, a flash drive containing a list of securities held by the Credit Fund and the prices Lumiere wanted the friendly broker to quote for the securities.  Lumiere instructed the friendly broker to email the list of securities and prices back to him for year-end 2011 valuation purposes, which the friendly broker did.

    (c)    Lumiere instructed Trader, a junior employee and Lumiere's subordinate on the Credit Fund team, to solicit sham quotes from the friendly brokers.

11

    (d)     On at least one occasion, Lumiere instructed Trader to use his personal cell phone and a friendly broker's personal cell phone to solicit the sham quote.

49.     During the Relevant Period, Lumiere instructed Trader to reward the friendly brokers by giving them additional business, but Trader did not follow this directive.

50.     On or about April 14, 2013, Lumiere told a former Investment Adviser employee that he would disclose the "f***ing bullshit marking of the book" if Investment Adviser ever fired him.

51.     On or about January 14, 2014, Lumiere acknowledged to Trader, in sum and substance, that, throughout the Relevant Period:  (a) Lumiere knew Plaford mismarked securities held by the Credit Fund; (b) Lumiere obtained outside broker quotes at Plaford's direction at prices Lumiere knew were false; and (c) Lumiere directed Trader to obtain such sham quotes.

52.     During the Relevant Period, as a result of the mismarking scheme, the Credit Fund overvalued the mismarked securities.

53.     During the Relevant Period, Lumiere (together with Plaford) overrode the independent administrator's valuation for securities held by the Credit Fund on at least 311 occasions.  Of the 311 overrides, 284 (or more than 91 percent) furthered the object of the mismarking scheme – meaning the overrides resulted in higher valuations for long positions or lower valuations for short positions held by the Credit Fund.

54.     During the Relevant Period, the Credit Fund's month-end valuations for the securities Lumiere and Plaford mismarked were inflated, on average, between approximately 5 and 35 percent.

55.    During the Relevant Period, Lumiere knew or was reckless in not knowing the Credit Fund's month-end valuations for the mismarked securities were inflated and not consistent with prevailing market values.

56.    For example, during the Relevant Period, the Credit Fund:

(a)    relied on U-turned override quotes supplied by Lumiere and Plaford to overvalue – by anywhere from approximately 60 to 1,600 percent – a loan issued by ATI Enterprises, Inc. ("ATI" and "ATI Term Loan B"), a privately-held, for-profit school operator that defaulted on its loan obligations in June 2012.  The mismarked ATI Term Loan B position alone caused the Credit Fund to overstate its reported month-end NAV by around $11.5 million, or 3 percent, for July 2012;

(b)    relied on U-turned override quotes supplied by Lumiere and Plaford to overvalue – by anywhere from approximately 3 to 625 percent – a 4 percent coupon bond issued by China Medical Technologies, Inc. ("CMED" and "CMED 4% Bond"), a China-based medical device company that filed for bankruptcy in August 2012.  The mismarked CMED 4% Bond position alone caused the Credit Fund to overstate its reported month-end NAV by around $11 million, or 3 percent, for December 2012;

(c)    relied on U-turned override quotes supplied by Lumiere and Plaford to overvalue – by anywhere from approximately 3 to 22 percent – a bond issued by Oncure Holdings, Inc. ("Oncure"), a cancer treatment services company that filed for bankruptcy in June 2013.  The mismarked Oncure

position alone caused the Credit Fund to overstate its reported month-end

NAV by around $3.2 million, or 0.5 percent, in April 2012; and

(d)     relied on U-turned override quotes supplied by Lumiere and Plaford to

overvalue – by anywhere from approximately 3 to 28 percent – a bond

issued by Nebraska Book Company, a college bookstore company that

filed for bankruptcy in June 2011.  The mismarked Nebraska Book

Company position alone caused the Credit Fund to overstate its NAV by

around $2.4 million, or 0.5 percent, for December 2011.

57.     During the Relevant Period, as a result of the mismarking scheme, the Credit

Fund overstated its month-end NAV calculations, reported to investors and potential investors,

by approximately $10.9 million to $26.3 million or, in percentage terms, between approximately

2 and 7 percent per month, and, consequently, also reported to investors and prospective

investors a materially and falsely inflated NAV for year-end 2011 and year-end 2012.

58.     During the Relevant Period, Lumiere knew or was reckless in not knowing that,

as a result of the mismarking scheme, the Credit Fund reported to investors and prospective

investors a materially and falsely inflated NAV at each month's end, and at year-end 2011 and

year-end 2012.

59.     During the Relevant Period, as a result of the mismarking scheme, some investors

bought their Credit Fund investments at an inflated NAV, and other investors redeemed their

investments in the Credit Fund at an inflated NAV, thereby diluting the remaining Credit Fund

investors' interests.

60.     During the Relevant Period, as a result of the mismarking scheme, the Credit Fund reported materially and falsely inflated performance and/or returns to investors and prospective investors.

61.     During the Relevant Period, Lumiere knew or was reckless in not knowing that, as a result of the mismarking scheme, the Credit Fund reported materially and falsely inflated performance and/or returns to investors and prospective investors.

62.     But for the mismarking scheme, for 2011, the Credit Fund would have reported an annual loss of approximately 4 percent, instead of the 0.68 percent gain it reported to investors and prospective investors.

63.     But for the mismarking scheme, for 2012, the Credit Fund would have reported an annual gain of approximately 4 percent, instead of the 5.82 percent gain it reported to investors and prospective investors.

***Lumiere Engaged in a Manipulative Trade to Inflate the Apparent Value of a Credit Fund Security.***

64.     On or about March 23, 2012, Lumiere knowingly caused the Credit Fund to pay an above-market price for the CMED 4% Bond to inflate its apparent value and the apparent value of the Credit Fund's position in the CMED 4% Bond.

65.     On or about March 23, 2012, one of the friendly brokers offered Lumiere approximately $800,000 worth of the CMED 4% Bond at a per bond price in the "low 30's," meaning thirty-plus dollars per bond.

66.     Based on Lumiere's instructions, the friendly broker instead sold approximately $784,000 worth of the CMED 4% Bond to the Credit Fund at a price of around $43.25 per bond. Lumiere thus paid a higher per bond price than originally offered in order to further the mismarking scheme.

67.     Following the March 23, 2012 trade directed by Lumiere, Plaford directed Investment Adviser's back office to mark the Credit Fund's position in the CMED 4% Bond, based on Lumiere's trade, at $43.50 per bond, obviating the need for Lumiere and Plaford to do a valuation override in order to achieve their desired month-end valuation for the bond.

68.     The Credit Fund's March 2012 month-end valuation for the CMED 4% Bond of $43.50 per bond was more than 50 percent greater than it would have been if it were priced using the Reuters published price of $28.80 per bond.

**Lumiere Misclassified Distressed Assets in the Credit Fund as Having Observable Market Inputs for Valuation Purposes When They Did Not.**

69.     Lumiere's and Plaford's use of sham broker quotes repeatedly caused the Credit Fund's independent administrator to misclassify certain distressed assets held by the Credit Fund as having observable market inputs for the values at which they were marked when those assets did not have observable market inputs for the values at which they were marked.

70.     Monthly reports provided to Credit Fund investors by the fund's independent administrator disclosed the percentage of fund assets in each of three "fair value" classifications, as defined by ASC Topic 820.

71.     ASC Topic 820's framework for measuring fair value establishes a fair value hierarchy based on the quality of inputs used to value an asset or liability.  The inputs are categorized into three levels, corresponding to the nature of the inputs used in the valuation technique:  Level 1, the highest classification, is for assets or liabilities valued based on unadjusted quoted prices in active markets for identical assets or liabilities on the measurement date; Level 2 is for assets or liabilities that do not have quoted prices in active markets on the measurement date, but fair value can be calculated, directly or indirectly, based on observable

market inputs; and Level 3 is for assets or liabilities that lack observable market inputs and, therefore, are valued based on management estimates or pricing models.

72.     To certain Credit Fund investors, the ASC Topic 820 classifications were important because they enabled the investors to assess the liquidity of the Credit Fund's portfolio, with a Level 1 classification indicating the most liquid assets, Level 2, somewhat liquid assets, and Level 3, the least liquid assets.

73.     By fall 2012, both ATI and CMED had become distressed companies and, as a result, the trading in their debt, including the ATI Term Loan B and CMED 4% Bond, was thin and at prices that were far lower than Investment Adviser's valuations for these securities.

74.     The sham broker quotes Lumiere and Plaford U-turned through the friendly brokers to value the ATI Term Loan B and CMED 4% Bond falsely appeared to Investment Adviser's back office and the Credit Fund's independent administrator as observable market inputs for valuation purposes for those assets.

75.     Consequently, Investment Adviser classified the ATI Term Loan B and CMED 4% Bond as Level 2 assets, which relied on observable market inputs, and the Credit Fund's independent administrator reported them as Level 2 assets to Credit Fund investors in its monthly investor reports, instead of as Level 3 assets, which would have signaled to investors that the assets' values were derived not from observable market inputs and, therefore, the assets were less liquid.

76.     Investment Adviser did not classify any Credit Fund assets as Level 3 until December 2012, when the reported amount of the fund's Level 3 assets jumped from 0 to 8.97 percent, based primarily on a reclassification of the Credit Fund's CMED and ATI holdings from Level 2 to Level 3.

77.     But for Lumiere's and Plaford's use of sham broker quotes to value the ATI Term

Loan B and CMED 4% Bond positions, months prior to December 2012, Investment Adviser

would have had to mark down these assets to reflect their prevailing market values, or classify

them as Level 3 assets, in which case the Credit Fund's independent administrator would have

classified them as Level 3 assets in its monthly reports to Credit Fund investors.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and (c) Thereunder

78.     The Commission re-alleges and incorporates by reference paragraphs 1 through

77 of its Complaint.

79.     Defendant, directly or indirectly, singly or in concert, in connection with the

purchase and sale of securities, by use of the means or instrumentalities of interstate commerce,

or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:  (1)

has employed devices, schemes, or artifices to defraud; and/or (2) has engaged in acts, practices,

or courses of business which operate or would operate as a fraud or deceit upon other persons.

80.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert,

has violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15

U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations
### of Sections 206(1) and (2) of the Advisers Act

81.     The Commission re-alleges and incorporates by reference paragraphs 1 through

77 of its Complaint.

82.     Plaford, directly or indirectly, while acting as an investment adviser, by use of the

mails, and the means and instrumentalities of interstate commerce:  (1) knowingly or recklessly

has employed devices, schemes, or artifices to defraud clients or prospective clients; and/or (2) knowingly, recklessly, or negligently has engaged in transactions, practices, and courses of business which operated or would have operated as a fraud or deceit upon clients or prospective clients.

83.     By reason of the foregoing, Plaford, directly or indirectly, violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

84.     Lumiere, directly or indirectly, aided and abetted Plaford's primary violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] because he knowingly or recklessly provided substantial assistance to Plaford's violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Violations
of Section 206(4) of the Advisers Act
and Rule 206(4)-8(a)(2) Thereunder**

85.     The Commission re-alleges and incorporates by reference paragraphs 1 through 77 of its Complaint.

86.     Plaford, directly or indirectly, while acting as an investment adviser to a pooled investment vehicle, knowingly, recklessly, or negligently engaged in acts, practices or courses of business which were fraudulent, deceptive, or manipulative, with respect to an investor or prospective investor in the pooled investment vehicle.

87.     By reason of the foregoing, Plaford, directly or indirectly, violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder.

88.     Lumiere, directly or indirectly, aided and abetted Plaford's primary violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) [17 C.F.R. §

275.206(4)-8(a)(2)] thereunder because he knowingly or recklessly provided substantial assistance to Plaford's violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) [17 C.F.R. § 275.206(4)-8(a)(2)] thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests the Court enter a Final Judgment:

(a)      Finding that Defendant violated the securities laws alleged herein;

(b)      Permanently restraining and enjoining Defendant from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder; and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80-b6(2), and 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder;

(c)      Ordering Defendant to disgorge all ill-gotten gains received as a result of his violations of the federal securities laws and to pay prejudgment interest thereon;

(d)      Ordering Defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

(e)     Granting such other and further relief to the Commission as this Court may deem just and proper.


Dated:  June 15, 2016
        New York, New York

                              By:   _Sanjay Wadhwa_____
                                    Andrew M. Calamari
                                    Sanjay Wadhwa
                                    Charles D. Riely
                                    Valerie A. Szczepanik
                                    Alexander M. Vasilescu
                                    William T. Conway III
                                    Philip Moustakis
                                    Attorneys for Plaintiff
                                    SECURITIES AND EXCHANGE COMMISSION
                                    New York Regional Office
                                    Brookfield Place
                                    200 Vesey Street, Suite 400
                                    New York, New York  10281-1022
                                    (212) 336-0542 (Moustakis)